**RACHEL H. MITCHELL**
MARICOPA COUNTY ATTORNEY

BY:   KIM CHAMBERLAIN (031675)
      MICHAEL E. GOTTFRIED (010623)
      Kim.Chamberlain@mcao.maricopa.gov
      gottfrim@mcao.maricopa.gov
      Deputy County Attorneys

CIVIL SERVICES DIVISION
225 West Madison Street
Phoenix, Arizona 85003
Telephone (602) 506-8541
Facsimile (602) 506-4316
ca-civilmailbox@mcao.maricopa.gov
MCAO Firm No. 0003200

*Attorneys for Matt Hunter*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fernando Corona, a single man,<br><br>Plaintiff,<br><br>v.<br><br>Matt Hunter and Jane Doe Hunter, et al.,<br><br>Defendants. | NO. CV23-01251-PHX-JAT (CDB)<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56 and LRCiv 56.1, Defendant Matt Hunter moves for summary judgment on Plaintiff's First Amended Complaint ("FAC"), Doc. 18, because Defendant Hunter did not hit Plaintiff with a baton and did not cause Plaintiff's injuries.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    FACTUAL BACKGROUND

**A. Procedural History**

On June 9, 2023, Plaintiff filed a Complaint in state court against Matt Hunter and Maricopa County asserting state-law claims of negligence and battery against Hunter and

claims of negligent hiring, training, retention and supervision against the County. (Doc. 1-3 at 6-11.) Plaintiff also asserted 42 U.S.C. § 1983 claims of excessive force against Hunter and a *Monell* claim against the County. (*Id.*) On July 6, 2023, Defendants removed the action to this Court. (Doc. 1.) Defendants filed a Motion to Dismiss. (Doc. 6.) Plaintiff filed a First Amended Complaint on September 21, 2023. (Doc. 18.) Plaintiff removed the state-law claim against the County for negligent hiring, training, retention and supervision. (*Id.*) The remaining claims stayed the same. On October 2, 2023, Defendants filed a Motion to Dismiss. (Doc. 19.) The Court granted the Motion as to the *Monell* claim against the County and the punitive damages claim as to the state-law claims. (Doc. 32.) Maricopa County was dismissed from the action. (*Id.*) The remaining claims against Hunter were permitted to proceed. (*Id.*) Defendant Hunter now brings this Motion for Summary Judgment seeking dismissal of the remaining claims.

### B. Underlying Facts[1]

The totality of the events described in the FAC occurred in a matter of minutes. However, the gravamen of Plaintiff's allegation is that Lt. Matt Hunter struck him with a baton and injured him. (Doc. 18.) This action would have occurred in a split second. The underlying facts provide context and are taken from the investigation as a whole. Plaintiff filed a complaint with MCSO, thereby initiating an internal affairs investigation. *See generally* Ex. A. As a result, the parties and the Court have detailed information as to what occurred on June 18, 2022. However, the investigation exceeded the scope of this action, and many facts are not material to whether Lt. Hunter struck Plaintiff with a baton and injured him. Descriptions of the involved individuals are included to assist in viewing the

---

[1] Only material facts are to be included in the separate statement of facts. LRCiv 56.1(a); *see also Hunton v. American Zurich Ins. Co.,* 2018 WL 1182552 at *3 (D. Ariz. Mar 7, 2018) ("Importantly, these rules do not require each and every fact appearing in the motion to also be listed in a separate statement. Often, expositional facts are referenced in the motion because they provide the Court with context, and sometimes these expositional facts are disputed, but not in any way that matters to the outcome …. But these expositional facts have no place in a party's separate statement, which should be limited only to those factual assertions material to the disposition of the motion.").

body-worn camera ("BWC") footage and screen shots of the BWCs.

On June 18, 2022, Plaintiff floated down the Salt River on a tube with friends. (Doc. 18, ¶ 10.) After 2:00 p.m., he and his friends were waiting in line, along with hundreds of other people, to board a bus that would take them back to the parking lot. (Doc. 18, ¶ 11.) Plaintiff was wearing grey shorts, no shirt, and a black hat with Sandbar stitched in blue. Ex. A, MCSO 1727. By this time of day, Salt River tubers were generally hot, tired, and many had consumed alcohol and drugs. *Id.*, MCSO 1731, 1737, 1738, 1754, 1776, 1785. The Maricopa County Sheriff's Office ("MCSO") was aware of this dynamic. *Id.* After responding, MCSO deputies were taken aback by the large number of people waiting in line and contacted Salt River Tubing to have them send more buses immediately. Ex. H at 21:29:00 – 21:29:41; Ex. A, MCSO 1766. The deputies' priority was restoring order to a chaotic scene. Ex. F, MCSO 0010. The following events occurred within this context.

The line contained three separate groups of people relevant to the altercation at issue before the Court. *See* Ex. A, MCSO 1726. Plaintiff's group ("Group 3") was in line behind a group of at least four people ("Group 2"). In front of that group, two people were standing in line. Ex. F, MCSO 0004. They were part of a larger group of about 22 Hispanic people (collectively "Group 1"). *Id.*; Ex. A, MCSO 1726. The two people in line claim they were "holding a spot" for the rest of Group 1. Ex. F, MCSO 0004. The remainder of Group 1 was standing to the side under a ramada, which provided shade. As the line moved forward, the remainder of Group 1 standing in the shade moved to join the two people standing in line. Ex. A, MCSO 1776. Group 2 and others viewed this as "cutting" in line and became upset. Ex. F., MCSO 0005; Ex. A, MCSO 1726.

Group 2 included Jack Roscoe and his then-girlfriend Jayne Ramirez. Ex. F, MCSO 0003. Jack was a tall, skinny, white 17-year-old male wearing a light pink hat and bright pink swim trunks. *Id.*; Ex. A, MCSO 1839. Jayne was a short 17-year-old female wearing a light-colored bikini with flowers on it. *Id.* Group 1 included Eliska Ramirez, her fiancé, and Ruben Ramos. Ex. A, MCSO 0002, 0010. Eliska was a 37-year-old woman wearing a

black swimsuit/bikini. *Id.,* MCSO 1825. Ruben Ramos was wearing a blue bandana.

Jake was upset about the remainder of Group 1 cutting in line. Ex. H at 21:29:00 – 21:29:41. He began a verbal confrontation. A short time later, Ruben ran up to Jack and sucker punched him. Ex. F, MCSO 0010 – 0013. The assault caused the verbal confrontation to morph into a large brawl. Plaintiff alleged that he "observed an adult woman begin to assault what appeared to be a teenage girl." (Doc. 18, ¶ 13.) The adult woman is believed to be Eliska Ramirez, and the teenage girl is believed to be Jayne Ramirez. Plaintiff asserted that, "[i]n order to protect the teenage girl from harm Plaintiff maneuvered his body between the teenager and the oncoming woman." (Doc. 18, ¶ 14.) Plaintiff further alleges that "[a]t no point did [he] engage in any physical fighting or even take a hostile stance towards anyone." (Doc. 18, ¶ 16.)[2] As a result of the melee, MCSO staff responded to the scene to restore order. Their primary goal was to separate people that were fighting. Once order was restored, they could then cite the instigators. Within a few minutes of the start of the brawl, Plaintiff wound up on the ground with an injured knee.

### C. Plaintiff's Statements

The first medical provider to interact with Plaintiff on June 18, 2022, was EMT Grant Venable. SOF ¶ 1. He was wearing an orange shirt and can be seen assisting Plaintiff in the body-worn cameras. Ex. A, MCSO 1838. Plaintiff was sitting on the ground holding his left knee. Ex. B, MCSO 0039. Plaintiff refused an ambulance. Ex. A, MCSO 1726. EMT Venable provided him with a long splint for the back of his left knee with a medical wrap and an ice pack. SOF ¶ 2. Plaintiff did not report any other injuries. SOF ¶ 3. Plaintiff did not tell EMT Venable that a deputy struck him with a baton. Ex. A, MCSO 1758.

Plaintiff went immediately to Mercy Gilbert Medical Center Emergency Department. SOF ¶ 4. Plaintiff informed medical professionals that "[d]uring the confrontation he states he was tackled by police officer and injured his left knee." SOF ¶ 5.

---

[2] The BWC does not support Plaintiff's allegations that his only involvement in the fight was to protect Jayne. However, Plaintiff's level of involvement is not material to the outcome of the case.

On June 19, 2022, Plaintiff informed Dr. Gary Purcell that he "sustained an injury [sic] to his left knee when he landed hard on the leg. He was out at the Salt River when 2 girls where [sic] fighting and he tried to break up the fight. The police apparently thought is [sic] was part of the fight and threw him away. He landed on his left leg. He noted immediate pain and was unable to ambulate." SOF ¶ 6.

A month later, on July 21, 2022, Plaintiff called the Maricopa County Sheriff's Office ("MCSO") to file a complaint against an officer. SOF ¶ 7. Plaintiff reported that the officer threw him to the ground. SOF ¶ 8. A few days later, on July 27, 2022, Sgt. Bryan Flanigan followed up with Plaintiff regarding his complaint. SOF ¶ 9. Plaintiff stated that he "got picked up, tossed to the ground, and [he] landed right on [his] knee." SOF ¶ 10. He also called it a "hip toss." SOF ¶ 11. He stated that he was in instant pain and knew something was wrong. SOF ¶ 12. His only mention of a baton was that he saw a deputy drop his baton. SOF ¶ 13. He later explained the officer was a shorter white male deputy. Ex. A, MCSO 1726. He claimed his feet came off the ground, and he came down directly on his left knee and had instant pain. SOF ¶ 14. He claimed the officer came up from behind him and the officer did not make any verbal statements prior to tossing him to the ground. SOF ¶ 15.

On November 15, 2022, Plaintiff filed a Notice of Claim. SOF ¶ 16. He alleged that he "placed himself between the girl and the oncoming woman." SOF ¶ 17. "At this point, an unknown Maricopa County Sheriff's Deputy grabbed [him] from behind and threw him forcibly to the ground." SOF ¶ 18. Plaintiff made no mention of a baton. SOF ¶ 19.

On March 13, 2023, after receiving and reviewing MCSO's incident report, Plaintiff determined that Lt. Matt Hunter hit him with a baton and injured him. He filed an Amended Notice of Claim to reflect his new story. SOF ¶ 20. Notably, the incident report included a supplement by MCSO Reserve Deputy Pablo Gonzalez.[3] Ex. F, MCSO 0018. Gonzalez reported that he saw Lt. Hunter:

---

[3] Reserve Deputy Pablo Gonzalez resigned from MCSO in April 2023.

> take out his baton and strike a Hispanic male in the left leg causing him to fall down on the ground. This male subject attempted to stand up and fell down. He looked at me and stated "I need help, I wasn't doing anything. I was trying to help that lady who was on the ground, and I got hit with a stick."

SOF ¶ 21. Plaintiff asserted that he was the person referred to in the supplement and adopted the story as his own. *See generally* Ex. D. Plaintiff did not explain why he was not aware that he was hit with a baton until he read this supplement, nor does he explain his previous statements that he landed on his knee thereby causing his injury. Plaintiff maintained that he placed himself between the girl and the oncoming woman. Ex. D, pg. 1. He alleged that "[a]t no point did [he] engage in any fighting, or even take an aggressive stance towards anyone." SOF ¶ 22. "Despite this, Hunter approached and, without warning or cause, struck him in the leg with a collapsible baton." SOF ¶ 23.

On June 9, 2023, Plaintiff filed a Complaint. (Doc. 1-3 at 6-11.) Plaintiff again asserted that he maneuvered his body between the teenage girl and the oncoming woman to protect the girl. (*Id.,* ¶ 14.) He asserted that "[a]t no point did [he] engage in any physical fighting or even take a hostile stance towards anyone." (*Id.,* ¶ 16.) He alleged that Lt. Hunter "approached Plaintiff's location, and without warning or cause struck Plaintiff in the leg with a collapsible baton." (*Id.,* ¶ 17.) Rather than identifying the injury to his knee, the Complaint alleged that he received three fractures in his leg. (*Id.,* ¶ 18.) Plaintiff's First Amended Complaint, filed on September 21, 2023, made the same factual allegations. (Doc. 18, ¶¶ 14-17, 22.)

In February 2024, Plaintiff provided additional detail. Plaintiff stated that he did not want to be involved in the fight, so he moved to the edge of the crowd. Ex. F, Interrogatory #3. He was worried about becoming engulfed in the fight. *Id.* Nevertheless, he stepped between the two females to protect the young woman. *Id.* He verbally asked the older woman to walk away. *Id.* Instead, she charged into him. *Id.* She fell down and got back up. *Id.* He turned toward the girl using his body to shield her from attacks.[4] *Id.* He was

---

[4] Plaintiff's story is contradicted by BWC. The facts, however, are not material to the

reassuring her when "he was struck in the knee from behind by a tall, bald MCSO deputy." SOF ¶ 24. He did not get a good look at the face of the deputy because he was struck from behind. SOF ¶ 25. But when he "looked up from the ground[,] he observed a tall, bald deputy dressed in uniform." SOF ¶ 26. He fell to the ground, and the deputy walked away armed with a baton. SOF ¶ 27. "Plaintiff then struggled to drag himself away from the scene to a nearby medic." Ex. F, Interrogatory #3.

Plaintiff does not identify anyone, including his friends, that can corroborate his story regarding how he was injured.

### D. Body-Worn Cameras and Defendant Matt Hunter's Statements

Lt. Matt Hunter denied Plaintiff's claims against him from the beginning. SOF ¶ 28. He did not know how Plaintiff was injured. As soon as Lt. Hunter arrived on scene, he immediately engaged in breaking up a fight centered on two women. SOF ¶ 29. Lt. Hunter reported that he struck a single person with a baton. SOF ¶ 30. He was unable to identify the two females, but they are believed to be Eliska and Jayne. Multiple BWCs record Jack and Jayne's statements that Jayne was struck in the thigh by a deputy. SOF ¶ 31. The BWCs show her rubbing her leg in pain. SOF ¶ 32. Hunter did not deploy his baton again.

The relevant MCSO staff are Lt. Hunter, Reserve Deputies William Prather[5] and Pablo Gonzalez, and Posseman William Jinks. Many more law enforcement officers arrived at the scene but are irrelevant to the issue before the Court. Deputy Prather's BWC, Exhibit H, was running and is the primary evidence in this case.[6] Lt. Hunter did not have his BWC turned on as he was responding to exigent circumstances and/or the body-worn camera failed to turn on. Ex. A, MCSO 1732. Posseman Jinks did not have a BWC. *Id.*, MCSO 1768. Deputy Gonzalez failed to turn on his BWC. *Id.*, MCSO 1788.

---

outcome of the Motion for Summary Judgment.

[5] Reserve Deputy William Prather resigned from MCSO in January 2023.

[6] BWCs use a universal time. 21:00:00 on the BWC is the equivalent of 2:00 p.m. Arizona time. The IA report refers to the time bar of Prather's BWC. For simplicity's sake between BWCs and to create an understandable timeline, Defendant refers to Arizona time.

Reserve Deputies Prather and Gonzalez were arriving at the scene serving as off-duty security and traffic control when the fight broke out. *Id.*, MCSO 1725. Posseman Jinks was in the parking lot at the time the fight started. *Id.* Hunter responded to the call for more units. He was the last to arrive out of these four responders. *Id.*

Prather's BWC is the first BWC to record. *See generally* Ex. H.[7] At 2:25:19 p.m., Prather was speaking to Eliska's fiancé. Ex. A, MCSO 1825. Eliska is on the left side of the screen. *Id.* Jake and Jayne are on the right side of the screen. *Id.* At 2:25:23 p.m., Eliska breaches the distance between her and Jayne. *Id.,* MCSO 1826. She places her hands around Jayne's throat. *Id.* Jayne pushes Eliska's hands away. *Id.* At 2:25:29 p.m., Eliska is in the forefront of the video. *Id.,* MCSO 1827. She is being held back by her fiancé. *Id.* In the distance, Jinks can be seen pulling back an unknown male. *Id.* Plaintiff and Jake are also involved in a physical confrontation. *Id.* A couple of frames later, but still at 2:25:29, Jayne is sitting on the ground near Plaintiff's feet. *Id.,* MCSO 1771. Jayne and Eliska are not near each other at this point, but Plaintiff is clearly engaged in a physical confrontation. *Id.* At 2:25:33 p.m., Prather moved, and the same individuals are seen from a different angle. *Id.,* MCSO 1827. Jinks has pulled the unknown male away, and he is on the ground. *Id.* Jake's pink shorts can be seen. *Id.* Plaintiff is still in the fray. *Id.* Jayne is sitting on the ground leaning against inner tubes. *Id.* Deputy Gonzalez is entering the shot from the left-hand side. This time frame is critical for another reason that will become obvious. The parking lot does not have any law enforcement vehicles parked in the background. *Id.,* MCSO 1771.

At 2:25:38 p.m., Eliska is walking toward Jayne. *Id.,* MCSO 1828. Plaintiff is watching. *Id.* Jinks is nearby. *Id.* At 2:25:40 p.m., Jake and Plaintiff try to intervene. *Id.* Plaintiff is pulling Eliska backward. *Id.* Prather turns. *Id.,* MCSO 1829. Plaintiff is still pulling Eliska away from Jayne, and Jake is also trying to help Jayne. *Id.* Lt. Hunter's white

---

[7] All references to BWC in the remainder of this section refer to Prather's BWC, Ex. H, unless otherwise noted. Screen shots from Prather's BWC are found at Ex. A at MCSO 1825 – 1839 and 1770 – 1771. Defendant cites primarily to the screen shots.

MARICOPA COUNTY ATTORNEY'S OFFICE
CIVIL SERVICES DIVISION
225 WEST MADISON STREET
PHOENIX, ARIZONA 85003

8

Ford F-150 pickup truck[8] was headed toward the location of the fight, but he had not quite arrived at the spot where he parked. SOF ¶ 33. At 2:25:41 p.m., Jake and/or Plaintiff successfully pulled Eliska away and then pushed her further away. Ex. A, MCSO 1829 – 1830. Jinks can see that Jake, Eliska and Plaintiff are physically involved in an altercation. *Id.* Jinks was trying to break up the fights by separating people and pulling people off other people. *Id.*, MCSO 1737. From Jinks' point of view, it could appear that Plaintiff was the aggressor as he is essentially throwing Eliska away from him.[9] *Id.*, MCSO 1829 – 1830.

At 2:25:42 p.m., Jinks pushes Plaintiff and Plaintiff is seen falling toward the ground.[10] SOF ¶ 34. However, Jinks is not looking at Plaintiff; he is looking at Jake. Ex. A, MCSO 1830. He immediately goes to Jake to pull him off someone else. *Id.,* MCSO 1831. Jinks later explained that he had no memory of any interaction with Plaintiff. *Id.*, MCSO 1774. This frame also reveals another critical piece of information. On the left-hand side of the screen, Deputy Gonzalez's back is toward Prather. SOF ¶ 35. At the exact time Plaintiff is falling, Gonzalez is facing the opposite direction. SOF ¶ 36. He could not have seen Plaintiff fall or how the fall occurred. At 2:25:43 p.m., Plaintiff is on the ground on his back with his feet up in the air. SOF ¶ 37. The next frame shows Plaintiff rolling over onto his left side with his knees bent. SOF ¶ 38. At the same time, Jinks is pulling Jake back. Ex. A, MCSO 1832. At 2:25:44 p.m., Prather turns to speak to Eliska. *Id.* In the background, Hunter's vehicle can be seen at the site where he parked his vehicle. SOF ¶ 39. Hunter could not have had any interaction with Plaintiff prior to his injury. At 2:25:45 p.m., Prather turns

---

[8] Lt. Hunter was the only official who responded in a white pickup truck and parked in or near the location shown in the video. *See* MCSO1841; MCSO1731.

[9] Defendant is not asserting that Plaintiff was the aggressor, but this was an active scene that was constantly changing. Events must be viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396 (1989).

[10] Defendant assumes for purposes of this Motion only that Jinks pushed Plaintiff. The BWC does not definitively prove there was a push. Ex. A, MCSO 1773 – 1774. Plaintiff could have tripped over an innertube or some other item on the ground. However, Defendant views the BWC in the light most favorable to Plaintiff. Ultimately, whether Jinks pushed Plaintiff or he tripped, the fact remains that Hunter did not hit Plaintiff with a baton.

back to the fight. Ex. A, MCSO 1833. Jayne is at the far left of the screen. *Id.* Gonzalez is still facing away from Plaintiff's location on the ground. SOF ¶ 40.

At 2:26:01 p.m., Plaintiff is still on the ground. SOF ¶ 41. At this point, Hunter is out of his vehicle and is on the far right of the screen. SOF ¶ 42. He was trying to break up a fight between Eliska and Jayne, which was near where he parked his vehicle. SOF ¶ 43. He dropped his baton and reached over to pick it up. SOF ¶ 44. The baton dropped near where Plaintiff was sitting on the ground. SOF ¶ 45. Hunter was not looking toward Plaintiff. SOF ¶ 46. His attention was focused on Jayne and Eliska. SOF ¶ 47. It is unknown if Hunter struck Jayne in the thigh before or after he picked up his baton. Plaintiff may or may not have seen Hunter after he was already injured and on the ground. But if he did, Hunter was in front of him, not coming at him from behind while he was standing. SOF ¶ 48. At 2:26:02 p.m., Hunter appeared to be swinging his baton toward Jayne. SOF ¶ 49. Plaintiff is not close enough to have been hit accidentally on the backswing. At this point, less than a minute has passed from the time Eliska grabbed Jayne's throat. The fighting quickly subsided. *See generally* Exs. H and I.

At 2:28:32 p.m., Plaintiff is on the ground being assisted by the medic, and Gonzalez is standing there watching. SOF ¶ 50. At 2:31 p.m., Hunter's white pick-up truck is moved to make way for the buses. Ex. I at 21:31. At 2:39 p.m., the medic is finished treating Plaintiff, and a couple of deputies help Plaintiff to his feet. SOF ¶ 51. Plaintiff refuses an ambulance and signs the necessary paperwork. SOF ¶ 52. A deputy helps Plaintiff get on the bus. SOF ¶ 53. At no point does Plaintiff move from his location on the ground until he gets up to board the bus. The medic believes Plaintiff was injured from being knocked down from people who were fighting. Ex. A, MCSO 1757. He has not treated anyone who said they were struck with a baton. *Id.*, MCSO 1758.

At 2:40:28, Jayne is holding an ice pack on her leg where she was struck with a baton. *Id.*, MCSO 1839. She stated that an officer struck her with a baton. *Id.* Hunter's report and Jayne's statements match up.

## II. LEGAL STANDARD

"[I]f the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment must be granted. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007). A videotape of the incident contradicting the opponent's version of events meets this standard. *Id.* at 378-79. Courts should "view[] the facts in the light depicted by the videotape." *Id.* at 380-81.

The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party's burden "may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party meets this initial burden, the burden is shifted to the opposing party, who must demonstrate the existence of a factual dispute and that the fact in contention is material, *i.e.,* a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, *i.e.,* the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

## III. ANALYSIS

On the day of the incident, Plaintiff alleged he was "tackled" or "thrown" by an officer causing him to fall. SOF ¶ 4. He landed on his knee and felt instant pain. SOF ¶ 6.

His story changed by degrees over the next nine month. Later versions alleged that he was assaulted from behind with no notice. SOF ¶¶ 15, 18, 24. After nine months, Plaintiff completely changed his story and alleged that Lt. Hunter hit him with a baton rather than being pushed, shoved, tackled, or thrown to the ground. SOF ¶ 20. He claimed the baton caused his injury rather than landing on his knee. (Doc. 18 ¶ 26.) The facts alleged in Plaintiff's FAC are contradicted by video. Plaintiff was pushed by Jinks in the process of trying to break up a large fight. SOF ¶ 34. When Plaintiff fell, he landed on his knee, thereby injuring it. SOF ¶¶ 6, 10, 12, 14. Plaintiff's repeated allegations that he was attacked from behind are also contradicted by video. SOF ¶¶ 15, 18, 24.

When video "clearly contradicts the version of the story told by [plaintiff], … so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott,* 550 U.S. at 378, 380. Like in *Scott*, Plaintiff's multiple versions of events are so "utterly discredited by the record that no reasonable jury could [] believe him." *Id.* at 380. Four critical facts, captured by video, destroy any possibility that Lt. Hunter bears any responsibility for Plaintiff's injury.

First, Posseman Jinks pushed Plaintiff, *not* Lt. Hunter. SOF ¶ 34.

Second, Posseman Jinks *pushed* Plaintiff. *Id.* He did not strike him with a baton. He did not tackle him. He did not throw him forcibly to the ground. He did not "hip toss" him. He did not attack him from behind. Plaintiff was injured when he his knee hit the ground after being pushed. This is consistent with his statements made within the first few days of the incident.

Third, Gonzalez could not have seen Lt. Hunter hit Plaintiff with a baton or how Plaintiff ended up on the ground. *See* SOF ¶¶ 21, 35, 36. His back was to Plaintiff and Jinks when Plaintiff fell. Plaintiff did not get back up until he was helped onto the bus.

Fourth, Lt. Hunter did not interact with Plaintiff in any way. As proven by video, Lt. Hunter did not arrive on scene until about the same time as Jinks pushed Plaintiff, and Plaintiff fell. After his injury, Lt. Hunter was in close proximity to Plaintiff, but his attention

was directed away from Plaintiff. As is documented by many BWCs, Plaintiff could not walk, and he remained on the ground until deputies help him to his feet and helped him get on the bus. Lt. Hunter simply could not have hit Plaintiff with a baton.

Lt. Hunter is the only Defendant remaining in this action. The only material fact before the Court is whether Lt. Hunter hit Plaintiff with a baton, thereby causing Plaintiff's knee or leg injury. This single fact underlies all legal theories of liability against Hunter, whether it be battery, negligence, or excessive force. This single fact is not in genuine dispute because the incident was captured on video and contradicts Plaintiff's various versions of events. Because Plaintiff alleged his injury was caused by Lt. Hunter hitting him with a baton, and because Lt. Hunter did not, the case is over. Lt. Hunter seeks dismissal of this action.

## IV.  CONCLUSION

For the foregoing reasons, Defendant Hunter asks the Court to grant summary judgment in his favor and dismiss the action.

RESPECTFULLY submitted this 5th day of March 2025.

                RACHEL H. MITCHELL
                MARICOPA COUNTY ATTORNEY

BY:   */s/ Kim Chamberlain*
        KIM CHAMBERLAIN
        MICHAEL E. GOTTFRIED
        Deputy County Attorneys
        *Attorneys for Matt Hunter*

## CERTIFICATE OF SERVICE

Per Article II(D)(3) of the Electronic Case Filing Administrative Policies and Procedures Manual, "No certificate of service is required when a paper is served by filing it with the court's electronic-filing system." If the foregoing document is served on a party not listed in the Court's Case Management/Electronic Case Files (CM/ECF) System, service by paper copy will be indicated below or a certificate of service will be filed separately within a reasonable time after service.

*/s/ A. Moreno*

S:\CIVIL\CIV\Matters\CJ\2022\Corona v. Hunter 2022-3239\Pleadings\Word (PDF)\MSJ.docx