Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
(520) 623-1922
gattonecivilrightslaw@gmail.com
*Attorney for Plaintiff*

**IN THE FEDERAL DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

Fernando Corona,

      Plaintiff,

v.

Matt Hunter,

      Defendants.

Case No. 2:23-cv-01251-JAT-CDB

**PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

      Pursuant to Rule 56, Fed.R.Civ.P. Plaintiff opposes Defendant's motion for summary judgment. Defendant (referred to here as Lt. Hunter) seeks "dismissal of the remaining claims." Doc. 60 at 2. The operative complaint is Plaintiff's First Amended Complaint containing two state-law counts and two federal-law counts. Doc. 18. This Court subsequently dismissed one count. Doc. 32 (dismissing Plaintiff's Fourth Amendment excessive force claim brought under a *Monell* theory). Consequently, Defendant's motion

seeks dismissal of Count I (battery), Count II (negligence), and Count III (Fourth Amendment excessive force naming Defendant in his individual capacity).[1]

## LEGAL STANDARD

Federal courts remove from the jury only "sparingly" cases of excessive force. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). This is particularly true where, as here, summary judgment is sought on causation grounds. "Causation is generally a question of fact for the jury", *Barrett v. Harris*, 207 Ariz. 374, 378 (Ct. App. 2004), and summary judgment on causation is appropriate only where there is "no reasonable chance or likelihood that the conclusions of reasonable persons would differ." *Petolicchio v. Santa Cruz Cnty. Fair*, 177 Ariz. 256, 262 (1994).

## FACTUAL BACKGROUND

Plaintiff generally accepts the factual background provided by Defendant. For this reason, Plaintiff highlights and adds factual nuance where appropriate, always presenting these additional facts and nuance in chronological order. References to Doc. 60 are to Defendant's motion for summary judgment.

The parties agree that the following four uniformed personnel were on scene during the relevant moments: Lt. Matt Hunter (the Defendant here), Reserve Deputy Pablo Gonzalez, Reserve Deputy William Prather, and Posseman William Jinks. Doc. 60 at 7. In addition to these four, a fifth law enforcement personnel was present but not identified by

---

[1] The First Amended Complaint contains a clerical error. The FAC inadvertently features two Count IVs and omits a Count III. For purposes of this motion, Plaintiff refers to Count III as the Fourth Amendment excessive force claim, naming Lt. Hunter in his individual capacity.

Defendant. John Sahlberg was serving as a volunteer chaplain with MCSO. PSOF 2. That day, Mr. Sahlberg's supervisor encouraged him to ride around to different sites to "experience and see what people are doing." PSOF 4. Mr. Sahlberg lacked enforcement capabilities but he wore a tan shirt with embroidered law enforcement patches and a badge. PSOF 5. Including Mr. Sahlberg, there were five law enforcement eyewitnesses.

Although departmental policies required deputies to turn on their department-issued body-worn cameras prior to arriving at calls such as this, Deputy Prather was the only deputy to have successfully activated his body-worn camera during relevant moments. PSOF 12; Doc. 60 at 7 ("Deputy Prather's BWC was running"); Id. at 8 ("Prather's BWC is the first BWC to record"). Even still, he turned on his camera only after some of the events had transpired. PSOF 13. Defendant acknowledges the chaotic scene confronting these five law enforcement personnel but downplays the scale of it. The total crowd size was estimated as 500 to 3,000 people. PSOF 14. The immediate fighting was among a smaller crowd consisting of between 10 and 30 civilians. PSOF 15. When fighting initially broke out – moments before the arrival of Deputies Gonzalez and Prather – one civilian later described it as "all hell break[ing] lose." PSOF 16.

Mr. Sahlberg was the only law enforcement-associated person on scene when the fighting broke out. PSOF 7. He described the start of the fight this way:

> A white male with blonde hair ran up to Sahlberg's left side. Then a Hispanic man ran up and punched him in the face. The guy went down and then Sahlberg fell to his knees and then to the ground as he was knocked down by the mob of people who were there. Sahlberg heard someone say that was a chaplain down there as he was at the bottom of a pile of people. PSOF 18, 19, 20.

A civilian eyewitness described the same moment similarly:

[A] short Mexican man . . . just uppercuts the kid in front of us, and just all hell breaks loose after that. There was a Mexican mom and a family that jumped on the 16-year-old girl in front of us that was part of the other group. PSOF 47.

Posseman Jinks was the second law enforcement associated person to arrive. PSOF 8. As he drove into the parking lot, he observed the exact moment described above. "[M]ost of the people's heads in the area rotate inward to one specific area", then, as Jinks was parking his vehicle, he observed Mr. Sahlberg "between two other males who were squaring off." PSOF 22, 23. Deputies Prather and Gonzalez arrived seconds later in the same vehicle, as the fighting was still in its escalation phase. PSOF 9. Lt. Hunter arrived seconds after that in a white Ford F-150. PSOF 10, 11. Prior to Lt. Hunter's arrival, neither Deputy Prather, nor Deputy Gonzalez, nor Posseman Jinks removed their batons from their duty belts. PSOF 24, 39.

As he was parking his vehicle, Lt. Hunter observed "two females actively and violently fighting with each other", with the two females "surrounded by handfuls of other people who were fighting as well." PSOF 25. Upon exiting his vehicle, Lt. Hunter "went right to the area where the fighting was occurring," PSOF 25, and immediately pulled out his expandable baton. PSOF 26, 28, 29. A civilian eyewitness described the actions of a "white male" uniformed deputy: "he comes and brings out his baton, and he just starts wailing on everybody in the pile. Doesn't even care what's happening." PSOF 29, 47. Lt. Hunter is balding and presents as a white male. PSOF 3. Deputy Prather later described Lt. Hunter

"swinging his baton back and forth" and "spinning around swinging his baton." PSOF 34. Deputy Gonzalez described Lt. Hunter using his baton "to disperse the crowd" and recalled thinking that this tactic was "effective." PSOF 40. Posseman Jinks "heard the sound of an expandable baton being extended and looked over and saw Hunter with his baton out." PSOF 35.

Up to this point, the parties are in general agreement (with the exception of Mr. Sahlberg being an additional law enforcement presence). Nevertheless, the precise timing of Lt. Hunter's arrival to the scene demands additional examination. Lt. Hunter suggests that he could not have struck Plaintiff with his baton, in part, because he "did not arrive on scene until about the same time as Jinks pushed Plaintiff." Doc. 60 at 12. It is accurate to say that Lt. Hunter arrived to the scene "about the same time as Jinks pushed Plaintiff", but it lacks precision. Jinks pushing Plaintiff and Lt. Hunter arriving to the scene are much closer in time than Defendant suggests. Based on an independent review of Deputy Prather's video conducted by MCSO's post-incident review, Lt. Hunter exited his white pickup truck two or three seconds after Plaintiff tumbled to the ground from the initial push. PSOF 11, 27 (comparing the 46-second mark to the 47-second mark and 49-second mark of Deputy Prather's video, based on the version of the video reviewed by MCSO internal affairs investigators).

Lt. Hunter was not the only deputy displaying a baton. Posseman Jinks, hearing the recognizable sound of an expandable baton, looked in Lt. Hunter's direction and saw that Lt. Hunter had arrived. Observing his higher-ranking colleague, PSOF 17, utilizing a baton

"prompted Jinks to pull out his baton." PSOF 35. Consequently, Lt. Hunter displayed his baton before Jinks. PSOF 28, 35. Jinks himself denies having hit anyone with his baton. PSOF 37. According to Jinks, he "had no reason to [use the baton] besides to have it out" as deterrence. PSOF 36. Deputy Prather's body-worn camera footage corroborates this, showing that Jinks likely has both hands free as he engages with Plaintiff and another civilian male. PSOF 38 (isolated screen shots of Dep. Prather's video prepared by MCSO). Consequently, it is likely that Jinks pulled out his baton after Plaintiff was struck. Similarly, it is likely that the civilian eyewitness who saw a white male deputy "wailing on everybody" was observing Lt. Hunter – not Jinks. After all, Lt. Hunter was only law enforcement officer seen striking anyone with his baton. PSOF 29. This is reinforced by Deputy Prather's independent recollection that Lt. Hunter was "swinging his baton back and forth" and "spinning around swinging his baton." PSOF 34.

Setting aside the accuracy of the "wailing on everybody" description, it is undisputed that Lt. Hunter struck teenage partygoer Jayne Ramirez two to three times in the leg within seconds of exiting his vehicle. Jayne recalls it this way: an older woman "started choking me & swinging at my face . . . then in the corner of my eye I see a police officer swing & hit me with a police baton." PSOF 32. Lt. Hunter acknowledged landing 2-3 strikes in a written report and during two subsequent investigative interviews. PSOF 31. Civilian eyewitness Alexandria Kasulka remembers the same baton strikes on a teenage girl. PSOF 48. Furthermore, Lt. Hunter acknowledged that it happened right away after exiting his vehicle.

PSOF 25, 31. As Defendant correctly points out, Jayne was at the center of the maelstrom in this moment. Doc. 60 at 4; PSOF 30.

As Lt. Hunter was striking Jayne, Deputy Gonzalez recalls standing between 4 and 10 feet from a still-standing Plaintiff. PSOF 41. Deputy Prather's body-worn camera footage corroborates this, showing Deputy Gonzalez standing at one critical moment next to a gentleman in a pink hat and pink swimming trunks, whom Defendant later identifies as Jake. PSOF 38; *see also* Doc. 60 at 8 (identifying man with pink shorts as Jake). Jake, in turn, was next to Plaintiff during the relevant seconds, and both men were being handled in some fashion by Posseman Jinks. Doc. 60 at 9 (Defendant noting that "Jake and/or Plaintiff successfully pulled Eliska away," suggesting that the two men were so close to one another as to make it difficult to distinguish who was performing which acts); *see also Id*. at 8 (Defendant notes that "Gonzalez is entering the shot from the left-hand side" as "Plaintiff is still in the fray"). Deputy Gonzalez later told investigators that he had "an unobstructed view" of Lt. Hunter "striking Fernando in the knee." PSOF 42. There are no facts to contradict Deputy Gonzalez's assertion that he had an unobstructed view. Defendant's only argument to the contrary is Deputy Prather's video. Doc. 60 at 9. As explained further below, Deputy Prather's body-worn camera pans away from Deputy Gonzalez in key moments.

Gonzalez's recollection is buttressed by another detail: he was not the only law enforcement personnel claiming to have seen it. Mr. Sahlberg (the volunteer MCSO chaplain) was still on the ground after having been knocked down and described what he observed:

Sahlberg . . . saw the action of a baton coming out, a strike, and a guy yelling as he went down. Sahlberg described the person struck with the baton as a Hispanic or tan male, but did not recall his clothing. Later in the interview, Sahlberg mentioned he thought the person struck with the baton was a male from his location on the ground . . . based on the person's build appearing larger and more solid. PSOF 46.

A later internal investigation conducted by MCSO called into doubt Sahlberg's credibility on this point, largely due to his "ever-changing story" regarding the type of vehicle from which he observed the assaulting deputy emerge while arriving to the scene with baton in hand. Mr. Sahlberg variously referred to the vehicle as a marked Sheriff SUV, an unmarked black SUV, a dark-colored SUV or truck, and possibly a lighter colored SUV or truck. PSOF 21. It is undisputed that Lt. Hunter emerged from a white F-150 pickup. PSOF 11. Despite Mr. Sahlberg's inability to accurately recall the type of vehicle associated with Lt. Hunter, there is corroborating evidence to suggest that Mr. Sahlberg would have remained on the ground and near the site of the baton strike in those moments. PSOF 18, 19, 20.

More importantly, a third witness recalled the same baton strike to a male subject. In sworn deposition testimony, civilian witness Alexandria Kasulka recalls seeing a white male deputy "wailing on everybody in the pile," then recalls seeing the deputy strike the person now understood to be Jayne Ramirez and "then he starts wailing again, and I think he hit [Plaintiff] at that point." PSOF 47, 48, 49. There is a clear sequence based on Ms. Kasulka's testimony: Jayne is struck, followed by Plaintiff. Finally, Lt. Hunter acknowledged the possibility that he inadvertently struck Plaintiff in the course of striking Jayne Ramirez and failed to realize it in the moment. PSOF 33. Although Lt. Hunter denied striking a male

subject, he had no specific reason to question Deputy Gonzalez's observation. PSOF 45. In fact, Lt. Hunter is not the only law enforcement officer who misremembered details surrounding the force deployed. For example, although Deputy Prather's body-worn camera suggests that Posseman Jinks pushed Plaintiff to the ground, Jinks does not independently recall doing this. In fact, when showed the body-worn camera footage, Jinks recognized other civilians with whom he interacted (such as pink-short-wearing Jake) but did not recall Plaintiff even after seeing images of him. PSOF 39. This helps to illustrate how quickly things unfolded – not only for Lt. Hunter but also for other law enforcement personnel.

Immediately following the incident, Plaintiff was unsure what exactly happened to him. Plaintiff was unsure if he was forced to the ground on one occasion or two. He was unsure if he was pushed to the ground or thrown to the ground. He was unsure about a baton strike. Even still, there is evidence that Plaintiff may have commented to at least two individuals on scene his belief that he had been struck in the knee by a blunt object. For example, Deputy Gonzalez recalled speaking with the Hispanic male whom he had previously observed being hit. The Hispanic male told Gonzalez: "I was trying to help this lady who was on the ground, and I got hit with a stick." PSOF 44. Similarly, Plaintiff's friend Tyler Erdmann recalls talking with Plaintiff later in the day about the nature of the injury. PSOF 50. He recalls Plaintiff telling him something "involving one of the sheriffs that either struck him on the knee or had thrown him to the ground, one of the two." PSOF 50. Similarly, at least two witnesses recall that Plaintiff may have been forced to the ground twice. In other words, witnesses believe they saw Plaintiff on the ground, get back up, and

then get forced to the ground a second time. One civilian witness and one law enforcement witness recall this possibility. PSOF 51, 52.

## LEGAL ARGUMENT

### I.   PLAINTIFF NEED PROVE ONLY THAT LT. HUNTER WAS A 'SUBSTANTIAL FACTOR' IN CAUSING HIS INJURIES.

Defendant is correct in identifying causation as a necessary element. See, e.g., *Stevenson v. Koskey*, 877 F.2d 1435, 1438 (9th Cir. 1989) (observing that, in Sec. 1983 cases, "courts turn to the causation factors developed in the common law of torts"). Defendant is incorrect, however, in suggesting that a single officer must be the sole cause of a particular injury. Just as in common law, Section 1983 plaintiffs must demonstrate that the tortfeasor's action "was a *substantial* factor -- not the sole factor." *Mears v. City of Los Angeles*, 2018 WL 11305362, at *8 (C.D. Cal. May 7, 2018). Ninth Circuit model jury instructions are in agreement. *See, e.g., Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008) (observing that, in a Sec. 1983 case, "[t]he jury was instructed that proximate cause exists where an act or omission played a substantial part in bringing about or actually causing the injury").

Plaintiff contends that there were two potential tortfeasors who contributed to Plaintiff's knee injury: Posseman Jinks (not a party to this action), and Lt. Hunter. By focusing exclusively on causation, Lt. Hunter invites a substantial factor analysis. When there are two tortfeasors that each independently acted unlawfully and causation is the only question, it is better that the "wrongdoers should be left to work out between themselves any

apportionment" than "the innocent wronged party . . . [be] deprived of his right to redress." *Summers v. Tice*, 199 P.2d 1, 5 (Calif. 1948). This is commonly the approach in Section 1983 cases. For example, in a Sec. 1983 excessive force case, the Seventh Circuit noted that "there are four possibilities in a tort case with multiple defendants":

> The first is that each defendant's act makes the injury to the plaintiff a little worse and it is the combination of the acts of separate defendants that does him in. Then each defendant is liable only for the increment in harm that he caused. An example would be several polluters of the same stream, and if one of them had not discharged pollutants the aggregate pollution would have been less severe . . .

> Second, each [tortfeasor] might by his own act have inflicted the entire injury, in the sense that, had he not committed the act, the injury would have been no less grave than it was, as when two persons shoot a third and each wound would have been fatal by itself. Again, both would be liable, but this time jointly and severally . . .

> Third, as in *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948), each defendant might have committed an act that is a tort when injury results (for there is no tort without an injury), but it is unclear which defendant's act was the one that inflicted the injury— both shot at the plaintiff, one missed, but we do not know which one missed. Again both are jointly and severally liable. This too may have been the case here with regard to the defendants or a subset of them. *Richman v. Sheahan*, 512 F.3d 876, 884–85 (7th Cir. 2008)[2]

A reasonable jury could conclude that Plaintiff was <u>both</u> pushed to the ground by Deputy Jinks <u>and</u> struck in the knee with Lt. Hunter's expandable baton. Put differently, Defendant's baton (perhaps inadvertently) struck Plaintiff in the knee while he was striking Jayne Ramirez and – therefore – Plaintiff's injury was the indivisible result of two officers acting independently. In multiple-tortfeasor cases, the substantial-factor test asks "whether

---

[2] The fourth possibility is so-called "bystander" liability and is not applicable here. Bystander liability occurs when an officer passively observes his co-worker violating the constitution without intervening.

each of the multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct." *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 507 (5th Cir. 2022) (finding causation in Sec. 1983 case).

Plaintiff can prove that Lt. Hunter was one of two law enforcement tortfeasors. This is because – despite a video showing Plaintiff being thrown or pushed by a *different* tortfeasor – **four eyewitnesses** saw a uniformed deputy swinging a baton in the crowd where Plaintiff was then located. Two of those witnesses were fellow law enforcement officers who recognized Lt. Hunter. One was Mr. Sahlberg who did not recognize Lt. Hunter by face but saw a baton associated with a deputy strike a nearby male subject. Deputy Prather failed to observe a direct strike to Plaintiff, but described Lt. Hunter as "swinging his baton back and forth" and "swinging his baton around his 360", suggesting an indiscriminate swinging. PSOF 34. Deputy Gonzalez stated there was "no doubt in his mind" that Lt. Hunter struck a short, Hispanic male in the knee. PSOF 43. This matches Plaintiff's physical description. PSOF 1. A fourth witness (civilian Alexandria Kasulka) was unfamiliar with Lt. Hunter but recognized Plaintiff and observed a "white male" deputy strike Plaintiff with a baton. PSOF 48, 49. This matches Lt. Hunter's physical description. PSOF 3.

Consequently, there is "significantly probative" evidence from which a jury could conclude that Plaintiff was forced to the ground by one deputy and struck by a baton wielded by a second deputy. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). At trial, Plaintiff will be expected to identify which of the three approaches to apportionment is most appropriate. In other words, the jury will ultimately decide whether Lt. Hunter is liable "only

for the increment in harm that he caused" under Theory #1, *Richman*, 512 F.3d at 884, or jointly and severally liable for the entire harm as in Theory #2 and Theory #3. Either way, the substantial factor test will determine whether Plaintiff put forward enough evidence that Lt. Hunter was at least one of the contributing factors to Plaintiff's harm. At the summary judgment stage, Plaintiff need only demonstrate that a reasonable jury could find there were two – not one – substantial factors leading to Plaintiff's injury.

## II.    DEFENDANT'S EFFORTS TO SECURE SUMMARY JUDGMENT BY UNDERMINING WITNESS CREDIBILITY ARE UNAVAILING.

"Credibility determinations . . . are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Yet Defendant generously addresses the credibility of at least two key witnesses: Plaintiff and Deputy Pablo Gonzalez. Doc. 60 at 12 (commenting that Plaintiff's "story changed by degrees over the next nine months"); Id. at 9 (noting that Gonzalez could not have seen what he claims to have seen).

### a.    Defendant's Effort to Undermine Deputy Pablo Gonzalez's Credibility is Unavailing.

Lt. Hunter takes pains to undermine the credibility of his fellow law enforcement officer, Pablo Gonzalez. Lt. Hunter argues that Deputy Gonzalez was incapable of seeing what he claims to have seen. Doc. 60 at 9 ("Gonzalez is facing the opposite direction"); *Id.* at 12 ("Gonzalez could not have seen . . . "). This is a quintessential credibility consideration. *See, e.g., Larson v. Nanos*, 2016 WL 4592184, at *6 (D. Ariz. June 21, 2016) (observing that witness credibility encompasses the "opportunity and ability" to see or hear the things

testified to"); *see also United States v. Griffith*, 762 F. Supp. 2d 1179, 1190 (D. Ariz. 2010) (making a credibility determination about a witness' ability to see). This principle applies equally to Sec. 1983 cases. *See, e.g., Crawford-El v. Britton*, 523 U.S. 574, 599 (1998) (observing that disputes about "credibility assessment[s]" are not "amenable to summary judgment"); *see also Easley v. City of Riverside*, 765 F. App'x 282, 284 (9th Cir. 2019) (reversing summary judgment in excessive force case because "credibility determinations are not permitted.")

     Even if credibility were an appropriate consideration, Plaintiff can demonstrate a genuine issue of material fact. Lt. Hunter argues that Deputy Prather's body-worn camera video forecloses any finding that he hit Plaintiff. In reality, the video footage is inconclusive. By Lt. Hunter's own admission, "Prather turns" in the critical moment. Doc. 60 at 8 (citing Exhibit H). Deputy Prather turns "to speak with Eliska" – the older woman who had been at the center of the fighting but quickly changed locations. *Id*. at 9. By doing so, Deputy Prather's camera is filming the parking lot rather than the crowd of 10-30 people. Doc. 60 at 9 (citing Defendant's SOF ¶ 39). Incidentally, Deputy Prather also turns away from Deputy Gonzalez. We cannot determine where Deputy Gonzalez is looking in the direction of Lt. Hunter as Deputy Prather turns away. After all, when Prather turns toward the parking lot, "Hunter's vehicle can be seen" fully parked but Hunter himself cannot be seen. Hunter's driver-side door is closed, and at no point in that moment does the car door open. Is that because Lt. Hunter is outside his vehicle, outside the frame, and already striking (or about to strike, or having just struck) Jayne in the thigh? Ultimately, this is for the jury to determine.

Moreoever, Deputy Gonzalez "fell to the ground a few times" during this moment "due to people pushing and shoving." See DSOF 36 (in disputing Defendant's fact, Plaintiff notes that Gonzalez fell multiple times during the confrontation). Consequently, a reasonable jury could conclude that Deputy Gonzalez observed Lt. Hunter striking the Hispanic male while on the ground and outside view of Dep. Prather's camera.

Other eyewitnesses can fill in the blanks where the camera footage falls short. And they do. Two other witnesses claim to have observed what Deputy Gonzalez observed: one law enforcement witness (Mr. Sahlberg) and one civilian witness (Alexandria Kasulka). PSOF 46, 49. Additionally, Deputy Prather saw the action of Lt. Hunter "swinging his baton back and forth" and "spinning around swinging his baton" in those same seconds. PSOF 34. In a subsequent interview with MCSO investigators, Lt. Hunter said "he was not going to discount the fact a male subject could have been hit" by his baton, but that "it was not his intent." PSOF 33. Simply put, this is not a case where a single witness asserts a fact but "fails to explain how he was in a position to observe" the fact. *Williams v. Seals*, 2020 WL 1066051 (9th Cir. Mar. 5, 2020) (allowing evidence during summary judgment going to a witness' ability to observe).

### b.  Deputy Gonzalez Consistently Maintained the Same Story and Has No Motive to Fabricate Evidence.

Following the incident, Deputy Gonzalez remained remarkably consistent in this particular detail. Shortly after the incident, Deputy Gonzalez told Lt. Hunter of what he observed and that he intended to prepare a supplement summarizing that detail. PSOF 45.

Subsequently, Gonzalez authored the supplement as promised. Doc. 60 at 6 (quoting from Dep. Gonzalez's supplement). Then, on January 16, 2023 – approximately 1.5 years after the incident – Gonzalez was interviewed by MCSO investigators. During that interview, Gonzalez "remained adamant about his recollection" and stated "there was no doubt in his mind" about Lt. Hunter striking a Hispanic male in the leg. PSOF 43. At the time of the incident, Gonzalez had been a law enforcement officer for 38 years, suggesting that he had a well-developed eye for quick-moving situations. PSOF 6.

Defendant has offered no potential motive for Gonzalez to lie. While credibility is generally not to be considered at the summary judgment stage, there is one element of credibility – motive – that may be considered in limited circumstances. The Supreme Court has suggested that courts at the summary judgment stage may consider whether there is an "absence of any plausible motive." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 596 (1986). Here, there is no suggestion that Gonzalez would want to falsely accuse a fellow law enforcement officer of excessive force.

### c.   Neither the Fourth Amendment nor Arizona Tort Law Requires a Victim to Immediately Perceive the True Source of his Injury.

In arguing that Plaintiff's knee injury resulted from a push rather than a baton strike, Lt. Hunter highlights Plaintiff's previous statements indicating as much. Doc. 60 at 4 (Plaintiff told medical professionals his injury stemmed from being "tackled"); *Id.* at 5 (Plaintiff filed an internal affairs complaint about being "thrown to the ground"); *Id.* at 11

(Plaintiff referring to being "thrown"). In doing so, Lt. Hunter argues that Plaintiff lacks credibility. *Id.* at 11-12. It is true that Plaintiff changed his story over time; it is also irrelevant.

Insisting that a victim of excessive force immediately identify the precise cause of his injury is like asking a plaintiff "rendered unconscious for the purpose of undergoing surgical treatment" to identify the surgical maneuver that caused the deformity. *Ybarra v. Spangard*, 154 P.2d 687, 690 (Cal. 1944). Like a Plaintiff injured by a surgeon while under general anesthesia, it is not uncommon for a civil rights plaintiff to be unaware of the cause of his injury until much later. To be sure, civil rights plaintiffs and personal injury plaintiffs must understand the true cause of their injury within the time prescribed by applicable statutes of limitations. But there is no requirement that a Plaintiff immediately understand the true cause of his injury where independent sources of evidence fill in the blanks. The same is true of run-of-the-mill car accident cases where the Plaintiff himself may be unaware of the other driver's identity or unaware of which driver violated traffic rules. In such cases, it is left to the lawyers and insurance company to make those findings. Consequently, Plaintiff's evolving understanding of what occurred at the Salt River does not establish a lack of a genuine issue of material fact.

**III.     ASSUMING THAT LT. HUNTER MADE CONTACT WITH PLAINTFF, HE 'SEIZED' PLAINTIFF EVEN IF INTENDING TO STRIKE SOMEONE ELSE.**

17

As this Court explained in its order on Defendant's motion to dismiss, a Fourth Amendment excessive force claim is predicated on a "seizure" having occurred. Doc. 32 at 3. A reasonable jury can conclude that Lt. Hunter struck Plaintiff while intending to strike Jayne Ramirez or otherwise intending to disperse the crowd. Although Lt. Hunter does not address this issue, it is worth noting that a Fourth Amendment seizure occurs anytime an officer intends to seize <u>someone</u> through the intentional application of a particular type of force, ie, "that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result," *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989), and the person is so seized. Construing the facts in the light most favorable to Plaintiff, Lt. Hunter intended to strike others with a particular weapon and, in fact, struck Plaintiff with that weapon.

Indeed, a seizure sometimes occurs even when the officer is unaware of the seized individual's existence. *Brendlin v. California*, 551 U.S. 249, 254 2007) (vehicle occupants are seized during a traffic stop even if officers learn of their existence afterward). Similarly, the Fourth Amendment protects individuals from excessive force where the officer learns of the injured person only after deploying the force. *Villanueva v. California*, 986 F.3d 1158, 1168–69 (9th Cir. 2021) (holding that passenger was seized when officers intentionally shot at a moving vehicle regardless of "whether [officers] even knew he was present"). To be sure, innocent bystanders are not seized simply because they caught an unlucky stray bullet or stood in the path of a runaway police canine. *See, e.g., Edmiston v. City of Port Angeles*, 360 F. Supp. 3d 1147, 1154 (W.D. Wash. 2018) (bystander was not 'seized' when he was

attacked by a police dog a quarter mile from the incident location). In this matter, however, Plaintiff was not a mere bystander. Among a large crowd estimated to consist of between 500 and 1,000 people, Plaintiff was within the immediate group of 20-30 individuals whom Lt. Hunter was intending to subdue.

In an analogous context, courts have concluded that a seizure occurs where nearby persons are unintentionally bitten by police dogs intentionally released to apprehend someone else. In *Rogers v. City of Kennewick*, a driver fled from his vehicle during a routine traffic stop, and a canine began efforts to "track" the suspect through the neighborhood. The dog broke free from its leash, entered a neighbor's yard, and apprehended "Mr. Rogers, who had been sleeping in the backyard of a neighboring residence."[3] The Ninth Circuit concluded that "it is of no consequence that the officers were not looking for Rogers specifically, so long as their actions were intentional." *Rogers v. City of Kennewick*, 205 F. App'x 491 (9th Cir. 2006). In *McKay v. City of Hayward*, a police dog and his police handler were tracking a suspect, the officer lifted his canine over an 8-foot wall in order to continue the pursuit, and the dog encountered an 89-year-old Jesse Porter who had no connection to the events. In concluding that Mr. Porter was seized, the district court noted it was irrelevant that "Mr. Porter was not the robber or the target of the search." *McKay v. City of Hayward*, 949 F. Supp. 2d 971 (N.D. Cal. 2013).

---

[3] The Ninth Circuit decision lacked a detailed factual background. The above details are drawn from the lower court. *See, Rogers v. City of Kennewick*, 2005 WL 8168055 (E.D. Wash. Mar. 21, 2005)

Similarly, the Ninth Circuit has addressed situations like this one where officers confronted a large group of partygoers who, fueled by alcohol, grew unruly. Ruling in favor of an injured partygoer, the Ninth Circuit found a seizure despite the fact that he was not "individually targeted." *Nelson v. City of Davis*, 685 F.3d 867, 876 (9th Cir. 2012). Officers fired into a crowd and, "[a]lthough [they] may have intended that the projectiles explode over the students' heads", they in fact struck the plaintiff in the course of "intentionally fir[ing] towards a group of which [plaintiff] was a member." Id. at 877. The unlucky partygoer was seized "regardless of whether he was the specific object of governmental force." *Id.* Just as in *Nelson*, Lt. Hunter directed his action in the direction of a group of which Plaintiff was a member.

## IV.   IT WAS CLEARLY ESTABLISHED THAT A LAW ENFORCEMENT OFFICER ACTS UNREASONABLY IN STRIKING A CITIZEN WITH A BATON UNDER THESE CIRCUMSTANCES.

Defendant's present motion is based exclusively on causation, but Defendant raised the affirmative defense of qualified immunity in his previous pleadings. *See* Doc. 33 at 7. By virtue of omitting a qualified immunity argument in his summary judgment briefing, Defendant has likely waived this affirmative defense. *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017) (suggesting that a defendant waives a qualified immunity defense by asserting it in their pleadings but then failing to raise it at summary judgment).

However, even if Defendant has preserved this affirmative defense, clearly established law existing prior to June 2022 places beyond debate the unconstitutionality of

Lt. Hunter's behavior. The Fourth Amendment prohibits "a completely unprovoked and unnecessary blow from a policeman's nightstick." *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988). The Ninth Circuit has long established that the "unnecessary strike of a nightstick" is the subject of Fourth Amendment inquiry and may cross the constitutional line. *Fontana v. Haskin*, 262 F.3d 871, 878 (9th Cir. 2001). Specifically, it is "regarded as 'intermediate force' that, while less severe than deadly force, nonetheless present a significant intrusion[.]" *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011). Indeed, during the use-of-force review process, MCSO staff agreed that a baton strike is properly classified as "intermediate less-lethal force." PSOF 53.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that this Court deny the motion for summary judgment because there remain genuine issues of material fact going to causation – whether Lt. Hunter's baton made physical contact with Plaintiff's leg on June 18, 2022.

Submitted this 6th day of June, 2025.


*/s Paul Gattone*
Paul Gattone
Counsel for Plaintiff

21