**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fernando Corona,<br><br>  Plaintiff,<br><br>v.<br><br>Matt Hunter, et al.,<br><br>  Defendants. | No. CV-23-01251-PHX-JAT (CDB)<br><br>**ORDER** |

Pending before the Court is Defendant Matt Hunter's ("Defendant," "Lt. Hunter") motion for summary judgment. (Docs. 60; 61 (statement of facts)). Plaintiff Fernando Corona responded. (Docs. 72; 73 (controverting statement of facts)). Defendant replied.[1] (Doc. 74). For the following reasons, the Court will deny Defendant's motion for summary judgment.

## I.     BACKGROUND

### a.  Factual Background

As discussed below, the crux of Defendant's motion is that Lt. Hunter did not hit Plaintiff with a baton. Accordingly, the Court will focus on the facts most pertinent to this specific issue.

///

///

---

[1] Defendant included a "controverting statement of facts" with the reply. (Doc. 75). Plaintiff filed a motion to strike Defendant's controverting statement of facts. (Doc. 76). Defendant responded but did not oppose the motion. (Doc. 77). Accordingly, the Magistrate Judge granted Plaintiff's motion. (Doc. 78).

### i. The Incident[2]

On June 18, 2022, Plaintiff finished floating the Salt River with friends and was waiting in line for a bus that would take the group back to the parking lot where they parked their cars. (Doc. 60 at 3). While in line, one group of people perceived what they believed to be another group "cutting in line." (Doc. 60 at 4). An individual verbally confronted the group suspected to have cut. (Doc. 60 at 4). This resulted in a physical altercation between two individuals before devolving "into a large brawl," which Plaintiff became involved in.[3] (Doc. 60 at 4).

The Maricopa County Sheriff's Office ("MCSO") responded to this scene. (Doc. 60 at 4). "The parties agree that the following four uniformed personnel were on scene during the relevant moments: Lt. Matt Hunter (the Defendant here), Reserve Deputy Pablo Gonzalez, Reserve Deputy William Prather, and Posseman William Jinks." (Doc. 72 at 2; Doc. 60 at 7).

It is undisputed that during the ensuing chaos, Posseman Jinks pushed Plaintiff and Plaintiff fell to the ground.[4] (Doc. 61 at 4 ¶ 34; Doc. 73 at 2 ¶ 4). However, the parties dispute what happened next.

Parties first dispute whether Plaintiff remained on the ground after being pushed by Posseman Jinks. Plaintiff says there are "at least two witnesses" who "believe they saw Plaintiff on the ground, get back up, and then get forced to the ground a second time." (Doc. 72 at 9–10; Doc. 73 at 11 ¶¶ 50–52). Defendant argues that body-worn camera footage shows that Plaintiff "remained on the ground until deputies help[ed] him to his feet and helped him get on the bus." (Doc. 60 at 13). It appears to the Court that the body-worn camera footage does not show Plaintiff standing after he was initially pushed and before he was helped up; however, as discussed below, there are at least 13 seconds of footage

---

[2] "Plaintiff generally accepts the factual background provided by Defendant." (Doc. 72 at 2).
[3] Plaintiff's level of involvement is disputed. Although Plaintiff states that he did not "engage in any physical fighting or [] take a hostile stance towards anyone," (Doc. 18 at 3), the body-worn camera footage calls this into doubt. However, the Court does not find Plaintiff's level of involvement material to the outcome of summary judgment.
[4] Although Posseman Jinks himself "disagreed he shoved [Plaintiff]" in his interview, (Doc. 73-2 at 65), parties agree that body-worn camera suggests otherwise.

where Plaintiff is out of frame.

According to Plaintiff, two to three seconds after Posseman Jinks pushed Plaintiff to the ground, Lt. Hunter "exited" his vehicle. (Doc. 73 at 8 ¶ 27 (citing body-worn camera stills)). It appears to the Court that the body-worn camera footage does not capture Lt. Hunter actually exiting his vehicle.

It is undisputed that, based on Lt. Hunter's own recollection, Lt. Hunter struck a female with his baton. (Doc. 61-1 at 23). Plaintiff posits that this happened "within seconds of [Lt. Hunter] exiting his vehicle." (Doc. 72 at 6). Plaintiff claims that Lt. Hunter *also* struck him with a baton. (Doc. 72 at 8–9). Plaintiff supports this claim with additional evidence, discussed below. In the end, Plaintiff received medical attention, both at the scene and afterward, for an injured knee. (Doc. 61 at 1–2; Doc. 61-4 at 2–3).

Plaintiff concedes that: "Immediately following the incident, Plaintiff was unsure what exactly happened to him. Plaintiff was unsure if he was forced to the ground on one occasion or two. He was unsure if he was pushed to the ground or thrown to the ground. He was unsure about a baton strike." (Doc. 72 at 9). Plaintiff also concedes that he "changed his story over time," but argues that such is "irrelevant."[5] (Doc. 72 at 17).

Defendant argues that the relevant body-worn camera footage "destroy[s] any possibility that Lt. Hunter bears any responsibility for Plaintiff's injury" because the footage "contradicts Plaintiff's various versions of events" and discredits Deputy Gonzalez's testimony. (Doc. 60 at 12–13).

### ii. Body-Worn Camera Footage

Both parties rely extensively on Deputy Prather's body-worn camera footage. The Court reviewed this footage, (Doc. 61-9 (received by the Clerk's office on March 6, 2025)), and finds the following timestamps[6] most relevant:

---

[5] The Court notes there are inconsistencies amongst Plaintiff's statements made over the course of this case, and specifically over the course of the MCSO investigation. The Court will not reproduce all those inconsistencies here because, on this record, the Court concludes that those inconsistencies go to Plaintiff's credibility, which the jury will have to decide.

[6] The Court's timestamps refer to the body-worn camera's timestamps, which are in "universal time," found in the upper right corner of the footage. (*See* Doc. 60 at 7 n. 6 ("[Body-worn cameras] use a universal time. 21:00:00 on the [camera] is the equivalent of

1   - 21:25:42: Posseman Jinks pushes Plaintiff, Plaintiff falls to the ground
2   - 21:25:44: First time that Lt. Hunter's white pickup truck can be seen in the
3       background
4   - 21:25:45: Plaintiff is on the ground, on his back or side
5   - 21:25:48: Deputy Prather turns away from Plaintiff
6   - 21:26:01: Deputy Prather turns back toward Plaintiff, who is on the ground, and Lt.
7       Hunter can be seen picking up his baton off the ground in close proximity to
8       Plaintiff[7]

### iii. Plaintiff's MSCO Complaint and Following Administrative Investigation

Approximately one month after the incident, on July 21, 2022, Plaintiff filed a complaint with MSCO. (Doc. 61-1 at 2). The complaint triggered an administrative investigation. As a part of that investigation, Plaintiff and involved MSCO individuals were interviewed. Portions of the most relevant interviews are discussed below.

MSCO received Plaintiff's first notice of claim, (Doc. 61-1 at 81), in November 2022, after eight employee interviews had already been conducted. (Doc. 61-1 at 80). MSCO received Plaintiff's second notice of claim in March 2023. (Doc. 61-1 at 83). At that time, the investigation "was initially completed and in the command review phase." (Doc. 61-1 at 82).

### 1. Defendant Hunter's Interview

Defendant Hunter "was initially interviewed due to being the first responding deputy to arrive on scene and also due to his [body worn camera] not being activated upon his arrival." (Doc. 61-1 at 21). He "was later interviewed as a principal . . . due to the 2nd notice of claim . . . which alleges Lt. Hunter struck [Plaintiff] with his baton." (Doc. 61-1 at 22). The Court took the following facts from the summary of Defendant Hunter's interview. The summary "is not a word for word translation," but it "accurately reflects the

---

2:00 p.m. Arizona time.")).
[7] Defendant agrees that Lt. Hunter was in close proximity to Plaintiff following Plaintiff's fall. (Doc. 60 at 12).

- 4 -

relevant content discussed."[8] (Doc. 61-1 at 21).

Defendant Hunter "drew his baton and struck one female 2-3 times in her leg." (Doc. 61-1 at 23). He "was unable to identify the female he struck as she w[a]ndered off." (Doc. 61-1 at 23). He later "pulled out his baton again and told [a female] to back up while utilizing verbal de-escalation." (Doc. 61-1 at 23). "Another individual tried to take Hunter's baton, unbeknownst to Hunter in the chaos." (Doc. 61-1 at 23). "At some point during these events Hunter realized his [body worn camera] was not activated, and he turned it on." (Doc. 61-1 at 23). He "was unaware of anyone else being struck by a baton, and he was unaware of any reports of injury." (Doc. 61-1 at 23). Later, in addressing Deputy Gonzalez's supplement, Lt. Hunter "felt it was possible a male subject may have been hit with a baton as he was delivering strikes to the female subject." (Doc. 61-1 at 24).

Defendant Hunter did not recall seeing the EMT that treated Plaintiff on the day of the fight. (Doc. 61-1 at 24). He "did not know who [Posseman] Jinks was engaged with during the fight" and he "did not have any information about [Plaintiff] or have any knowledge of [Plaintiff]," including whether Plaintiff needed medical attention or had reported injuries. (Doc. 61-1 at 24). "Hunter did not have any interaction or contact with [Plaintiff]." (Doc. 61-1 at 24).

Defendant Hunter was interviewed a second time to specifically "discuss [his] use of force regarding his baton usage, talk about his [body worn camera] usage and go over the notice of claim which claims he struck [Plaintiff] with his baton." (Doc. 61-1 at 92). At that interview, Defendant Hunter said he did not strike a male with a baton. (Doc. 61-1 at 95, 96, 97).

### 2. Deputy Gonzalez's Interview and Supplement

Deputy Gonzalez said he personally witnessed Lt. Hunter strike "a short Hispanic young man in the knee with his baton." (Doc. 73-2 at 76–77). Deputy Gonzalez provided additional detail surrounding the strike in his interview; the Court will not transpose it all here.[9]

---

[8] The Court will not repeat this, but it is true for all of the following interviews.
[9] The interviewer pointed out some inconsistencies with Deputy Gonzalez's "timeline and

Deputy Gonzalez "later informed Lt. Hunter he would be writing a supplement" because Gonzalez felt Lt. Hunter used poor judgment in utilizing his baton. (Doc. 73-2 at 77). In relevant part, Deputy Gonzalez's supplement states as follows:

> While all this fighting was going on, I noticed MCSO Lt. Matt Hunter who was in the middle of all these fights and assisting with breaking them up take out his baton and strike a Hispanic male in his left leg causing him to fall down to the ground. This male subject attempted to stand up and fell down. He looked at me and stated "I need help, I wasn't doing anything. I was trying to help that lady who was on the ground, and I got hit with a stick."

(Doc. 61-1 at 78).

Defendant Hunter addressed Deputy Gonzalez's supplement:

> Hunter mentioned Reserve Deputy Pablo Gonzalez's supplement which said Hunter struck a male. Hunter did not recall striking a male and none of his directed strikes were towards a male subject. Hunter felt it was possible a male subject may have been hit with a baton as he was delivering strikes to the female subject.
>
> Hunter read Gonzalez's supplement and responded he was not going to discount the fact a male subject could have been hit, but it was not his intent, and he was only focused on the females. He was not wildly and violently swinging his baton around like a helicopter. Hunter documented what he saw and his actions. If Gonzalez is saying he saw what he wrote, then that is what he saw and he was not going to ask him to change it as that is what he said he saw. Hunter did not recall if he spoke with Gonzalez about his supplement.

(Doc. 61-1 at 24).

### iv. Additional Witnesses[10]

Volunteer MSCO Chaplain John Sahlberg was interviewed as a part of the MSCO investigation. Mr. Sahlberg said he saw an officer strike a Hispanic or tan male with a baton. (Doc. 73-2 at 34). Plaintiff admits that Mr. Sahlberg was unable "to accurately recall the type of vehicle associated with Lt. Hunter," but notes that "there is corroborating evidence to suggest that Mr. Sahlberg would have remained on the ground and near the site of the baton strike in [key] moments." (Doc. 72 at 8). Defendant maintains that numerous, additional statements of Sahlberg cannot be reconciled with body-worn camera video

---

description of events." (Doc. 61-1 at 78). In response, "Gonzalez remained adamant about his recollection." (Doc. 61-1 at 78-79). The Court will not reproduce the inconsistencies because they go toward Deputy Gonzalez's credibility, which remains the province of the jury.
[10] Defendant in essence attacks the credibility of each of these witnesses. Again, credibility will be decided by the jury.

footage. (Doc. 74 at 6).

Alexandria Kasulka, a "civilian witness," testified in her deposition that a white, male cop brought out a baton and "start[ed] wailing on everybody in the pile." (Doc. 73-3 at 15). She stated that she thought this cop hit Plaintiff with his baton after he hit a 16-year-old girl in the leg. (Doc. 73-3 at 15-16). Defendant disputes Kasulka's testimony, pointing out inconsistencies and arguing that "Ms. Kasulka's testimony cannot be reconciled with the [body-worn cameras]." (Doc. 74 at 4–5).

Tyler Erdmann, another "civilian witness," testified in his deposition that although he could not "recall entirely," he believed Plaintiff told him on the day of the incident that Plaintiff's injury "involve[d] one of the sheriffs that either struck him on the knee or had thrown him to the ground, one of the two." (Doc. 73-4 at 12). Defendant does not address Mr. Erdmann's testimony.

**b. Procedural Background**

Plaintiff originally filed this case in Maricopa County Superior Court in June 2023. (Doc. 1-3 at 6–11). Defendants removed to federal court. (*See generally* Doc. 1). Defendants filed a motion to dismiss. (Doc. 6). Plaintiff then filed a motion for leave to proceed on an amended complaint, (Doc. 14), which was unopposed and granted by the Court. (Doc. 17; Doc. 18 (the amended complaint)).

Defendants then filed a motion to dismiss the first amended complaint and Plaintiff opposed the motion. (Docs. 19, 21). The Court dismissed Plaintiff's *Monell* claim against Maricopa County and accordingly dismissed Maricopa County. (Doc. 32). The remaining claims, all against Defendant Hunter, are: (1) battery, (2) negligence, and (3) excessive force.

Defendant Hunter filed his motion for summary judgment on March 5, 2025. (Docs. 60; 61 (statement of facts)). Plaintiff responded. (Docs. 72; 73 (controverting statement of facts)). Defendant replied. (Doc. 74).

/ / /

/ / /

## II.     LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.     ANALYSIS

The sole premise of Defendant's motion for summary judgment is that Defendant Hunter "did not hit Plaintiff with a baton and did not cause Plaintiff's injuries." (Doc. 60

at 1, 13 ("The only material fact before the Court is whether Lt. Hunter hit Plaintiff with a baton, thereby causing Plaintiff's knee or leg injury."); Doc. 74 at 9). Defendant argues that this issue "underlies all legal theories of liability." (Doc. 60 at 13). Thus, while the remaining claims of battery, negligence, and excessive force all have additional elements that Plaintiff would have to prove at trial,[11] Defendant does not move on any of those elements. Accordingly, for purposes of this Order, the Court will consider only the element on which Defendant's motion is based: whether there is a disputed issue of fact for trial as to whether Defendant Hunter hit Plaintiff with a baton.

Defendant concedes that Lt. Hunter could have struck Plaintiff with a baton "in a split second." (Doc. 60 at 2). After Lt. Hunter's vehicle appears at the scene, Deputy Prather's body-worn camera footage does not capture Plaintiff for approximately 13 seconds. In the same second that Plaintiff comes back into frame, Lt. Hunter is captured picking up a baton off the ground directly next to Plaintiff.[12] Drawing all inferences in Plaintiff's favor, Lt. Hunter could have struck Plaintiff with a baton during the 13 seconds not captured by body-worn camera footage. Accordingly, the Court cannot say that Plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Therefore, contrary to Defendant's argument, (Doc. 60 at 12), *Scott v. Harris* is inapposite.

Furthermore, Plaintiff presents additional evidence that bolsters the Court's conclusion that there is a genuine dispute of material fact regarding whether Lt. Hunter struck Plaintiff with a baton. Lt. Hunter himself stated, at least at one point, that it was "possible" he struck a male with his baton. (Doc. 73-2 at 24). Deputy Gonzalez stated that he personally witnessed Lt. Hunter strike a man fitting Plaintiff's description. (Doc. 73-2 at 76–77). Although Defendant argues that Deputy Gonzalez's "claims are not reconcilable with the [body-worn camera]," Plaintiff responds that "[t]here are no facts to contradict

---

[11] For example, excessive force requires a showing of "more force than was necessary under the circumstances."

[12] Defendant argues that Lt. Hunter "was [] bent at the waist rendering him incapable of a strong swing" and "was too far away from Plaintiff to injure him." (Doc. 74 at 3). These are clear factual disputes that a jury must resolve.

Deputy Gonzalez's assertion that he had an unobstructed view," and to the extent the body-worn camera footage sheds light on the issue, Deputy Prather's camera "pans away from Deputy Gonzalez in key moments." (Doc. 72 at 7). The Court need not go further. Although there are undoubtedly inconsistencies with Plaintiff's statements and some of Plaintiff's potential witnesses such that a jury may elect to disregard their testimony, such a credibility determination is within the jury's province, not the Court's.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** withdrawing the reference to the Magistrate Judge on the pending motion for summary judgment, (Doc. 60).

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment, (Doc. 60), is **DENIED**.

**IT IS FURTHER ORDERED** referring this case to Magistrate Judge Alison S Bachus (selected by random draw) for purposes of conducting a settlement conference. Within 14 days of this Order, the parties shall jointly contact Magistrate Judge Bachus' chambers (at 602-322-7610) to discuss a date and time for a settlement conference.

Dated this 21st day of July, 2025.

James A. Teilborg
Senior United States District Judge